757 So.2d 135 (2000)
Carolyn RICHARDSON, Louis Richardson, Earvin Allen, and Jessie Bouyer, individually and on behalf of all other similarly situated
v.
AMERICAN CYANAMID COMPANY.
Maeola Irvin, Valerie Brown, Oradel Seymore, Rev. Wilker State of Louisiana Neal, Kimberly Hartman and Dorothy Monroe, individually and on behalf of others similarly situated
v.
American Cyanamid Corporation and ABC Insurance Company.
Roy Chester Johnson and all other similarly situated
v.
American Cyanamid Company.
John D. Brown, et al.
v.
American Cyanamid Company.
Earnest Adams, et al.
v.
American Cyanamid, State of Louisiana, Parish of Jefferson.
Louis Larue and Robert G. Langston
v.
American Cyanamid Company.
Elmer Lebranch, et al.
v.
American Cyanamid Corporation And ABC Insurance Company.
Lori Little, Mary Brown, Kenneth Brown, and Kenneth Brown on behalf of minor, Eileen Bridgewater
v.
American Cyanamid Company.
Nos. 99-CA-675 to 99-CA-682.
Court of Appeal of Louisiana, Fifth Circuit.
February 29, 2000.
Writ Denied May 12, 2000.
*136 Samuel M. Yonter, Kenner, Louisiana, Wendell Gauthier, Julie B. Beiser, Metairie, Louisiana, Roy F. Amedee, Jr., Laplace, Louisiana, Frank C. Dudenhefer, Jr., New Orleans, Louisiana, Arthur O'Keefe, New Orleans, Louisiana, Robert J. Caluda, A.J. Rebennack, New Orleans, Louisiana, Attorneys for Plaintiffs/Appellants.
William F. Bologna, Gene W. Lafitte, Jr., New Orleans, Louisiana, Attorneys for Defendant/Appellee.
Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD A. DUFRESNE, Jr., and THOMAS F. DALEY.
*137 THOMAS F. DALEY, Judge.

INTRODUCTION:
Plaintiffs, representing a class, appeal the trial court's decertification of the class and dismissal of their claims with prejudice.

ISSUES:
We are called upon to determine the following:
(1) Did the trial court properly decertify the class;
(2) Did the trial court improperly render judgment against six class member plaintiffs?

FACTS AND PROCEDURAL HISTORY
This case arises from a sulfur dioxide emission from American Cyanamid Company's (Cyanamid) chemical facility located in Waggaman, Louisiana on August 11, 1992.
Immediately prior to this incident the plant was shut down to perform routine maintenance. During the start up process there was an imbalance in the plant's process. The amount of sulfur and the amount of oxygen being fed into the furnace were not adjusted properly resulting in a release of sulfur dioxide that exceeded the plant's DEQ Air Discharge Permit. The released sulfur dioxide formed a cloud or "plume," which was carried by the wind from the west bank of the Mississippi River, where the plant is located, towards the east bank in the direction of the City of Kenner. After 4:00 p.m. on April 11, 1992, several residents of Kenner called the fire department to report an unidentified odor in their neighborhood area. This prompted the Kenner Fire Department to send fire protection units to the areas where the odor was reported. These units detected no odor. Kenner officials called Cyanamid and were informed that a sulfur dioxide emission had occurred and that the levels of sulfur dioxide emitted exceeded the levels usually emitted by the facility. Cyanamid notified state and local authorities of the release. Thereafter, the company offered free medical examinations to anyone in the area who felt that they were adversely affected by the release. Three days after the release a class action petition was filed. The class members alleged physical and psychological injury as a result of the sulfur dioxide release with physical complaints ranging from burning eyes to diarrhea and nausea. Seven other lawsuits arising out of the same incident were consolidated with this class action.
A class action certification hearing was held on September 24, 1994. Judge Ellis, pro tem, certified the class. The defendant appealed to this court. With a five judge panel, this Court affirmed the certification but noted that La.Code Civ. P. art. 593.1(B) allows a trial judge to modify or recall his certification at any time prior to a decision on the merits. Richardson v. American Cyanamid Company, 95-898 (La.App. 5th Cir. 4/16/96), 672 So.2d 1161. The trial court set the geographic boundaries of the class on the east bank of the Mississippi River to include the boundary lines of the Town of Kenner, south of West Esplanade Avenue. Thereafter, the parties agreed that six class member plaintiffs would be selected and their individual damage claims would be presented at trial along with the issue of defendant's negligence. After trial, a Judgment decertifying the class and dismissing the six class members' claims was rendered by the trial court along with extensive Reasons for Judgment. Included in the reasons were detailed findings of facts, which included the following findings:
First, plaintiffs did not prove the magnitude of the emission at the stack. Dr. Reible, their expert, only gave a possible range or emission. The only evidence in the record as a magnitude is that of Dr. Schneller, who stated that, when they had gathered all of the information available, the emission rate could have ranged from .2 to .8 pounds per second, the latter rate being a worst case scenario. Since this is the only evidence in the record, and is based on all information *138 available, I find as a fact that the emission rate was within those parameters, and most probably in the neighborhood of .4 pounds per second....
I find that the evidence is uncontradicted that no individual in Kenner could have been exposed to a concentration of more than .36 parts per million, and then for only a few minutes....
I further find that none of the severe and ongoing symptoms testified to by the plaintiffs could have resulted from this emission. All of the scientific evidence is to the contrary....
I now find that there does not, and cannot exist a definable class of persons in the City of Kenner who were injured as a result of the emission event of August 11, 1992. I will therefore recall the certification order.... It may be that there are persons in Kenner who are so sensitive to sulphur dioxide that they would suffer symptoms or disease as a result of concentrations as low as those in this case. Such persons can pursue their actions individually....
I further find that the plaintiffs who testified in this case have failed to prove that their injuries resulted from this emission, and the suit is dismissed as to them.

ISSUE ONELAW AND ANALYSIS:
Appellants contend the trial court improperly decertified the class without the introduction of new evidence.
The plaintiffs argue incorrectly that the trial judge did not have authority to recall the certification order because the original certification was affirmed by this court, with writs to the Supreme Court being denied.
LSA-C.C.P. art. 593.1(B)[1] provided:
Furthermore, the court may at any time before decision on the merits alter, amend or recall its certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.
LSA-C.C.P. art. 592A(3)(c), which sets forth the current procedure scheme for class action certification, maintains the old rule that any time "before a decision of the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification." Based on these articles, we find the trial court had the authority to recall the class certification.
In Bernard v. Thigpen, 96-752 (La. App. 5th Cir. 4/29/97), 695 So.2d 518, this Court upheld certification early in the proceeding, but, as in the instant case, specifically noted that the trial judge "retains control of the proceeding and he can modify or even withdraw certification as the case develops, which could well happen here once causation is in focus." Id. at 520. The class is always subject to modification should later developments during the course of the proceedings require it. Johnson v. E.I. Dupont deNemours, Inc., 98-229 (La.App. 5th Cir. 10/14/98), 721 So.2d 41.
In this case the trial judge recalled the class certification after trial on the merits, but before a ruling on the merits of the class claims. The trial court's Judgment states:
IT IS ORDERED, ADJUDGED AND DECREED that this Court's Class Action Certification Order is recalled and all Class Action claims in these consolidated cases are dismissed, with prejudice;
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the claims of the plaintiffs, Wesley Tumblin, Sr., Christina Brown, Veronica Braggs, Lugene Gray, Sheilita Dunbar and Jannie Lee are dismissed, with prejudice;
The judgment recalls the prior certification order and then dismisses the claims of *139 the six plaintiffs who testified at trial. Appellants contend that the trial court erred by decertifying the class after a trial on the merits. This argument ignores the fact that no class wide ruling as to liability, causation or damages was made. Class actions usually consist of at least two stages; first, disposition of the common issues and second, the adjudication of noncommon individual issues. In this case the trial judge recalled the class certification first and then decided six individual plaintiffs' claims on the merits. When class certification is denied the trial judge may allow amendments and permit the action to proceed as an ordinary joinder proceeding on behalf of the parties named in the action. LSA-C.C.P. art. 593.1(A).
On rehearing in Ford v. Murphy Oil, U.S.A., Inc., 96-2913 (La.10/10/97), 710 So.2d 235, Justice Calogero comments on article 593.1(A):
Louisiana Code of Civil Procedure article 593.1 expressly provides that "the action shall be dismissed" if the court finds that the action should not be maintained as a class action. However, article 593.1 further provides that "[t]he court may permit amendment of the pleadings in the action to permit maintenance thereof as an ordinary proceeding on behalf of parties expressly named therein." Thus, even though article 593.1 mandates the dismissal of "the action" where maintenance as a class is appropriate for whatever reason, the article contemplates some character of preservation of the individual claims of the named plaintiffs, at least in some cases, even after the dismissal.
In this case after the class was decertified, but since the trial judge heard evidence on the issues of negligence, causation and damages as to the six individual plaintiffs, the trial judge ruled on their individual claims. All six class members were named plaintiffs. While the trial judge could not rule on non-named plaintiff class members after decertification without amendment to pleading or a new suit being filed, no amendment or additional evidence was necessary to rule on the six named plaintiffs. Judicial economy and fundamental fairness dictate that the trial judge rule on the claims of the six plaintiff class members who had the opportunity to present evidence of negligence, causation and damages at trial.
Appellants assert that the trial court recalled the class certification ruling without the presentation of new evidence. This claim ignores the extensive factual and expert testimony taken during the three days of trial. The trial judge concluded, based on the scientific evidence presented, that the exposure to the class was so minimal that the sulfur dioxide release would not cause injury to the vast majority of the class members. This finding by the trial court directly affected the numerosity and commonality requirements necessary for class certification. In order to sustain a class action, "it must be shown that the class is so numerous that joinder is impractical." Carr v. GAF, Inc., 97-0838 (La.App. 1st Cir. 4/8/98), 711 So.2d 802 at p. 805. The trial court recognized that there may be some people in Kenner, "who are so sensitive to sulfur dioxide that they would suffer symptoms as a result of concentrations as low as those proven in this case," and recognized that those persons could pursue their actions individually. The testimony of defendant's expert, Dr. Laura Green, supports this conclusion. The fact that the investigation by the City of Kenner Fire Department did not discover any foul odor or individuals in need of medical attention also supports the trial court's conclusion. We see no abuse of the vast discretion of the trial judge in his finding of fact.
Appellants in their reply brief assert that this incident and the injuries suffered by the class are no different than a number of the contemporaneous petrochemical emission cases, citing Andry v. Murphy Oil, U.S.A, Inc., 97-0793 (La.App. 4th Cir. 4/1/98), 710 So.2d 1126, Clement v. Occidental Chemical Corp., 97-246 (La.App. 5th *140 Cir. 9/17/97), 699 So.2d 1110, and McGee v. Shell Oil Co., 95-64 (La.App. 5th Cir. 6/28/95), 659 So.2d 812. While the cases cited affirmed the certification of a class, each case recognized the trial court's discretion in certifying and the trial court's authority to amend or recall its certification:
A trial court has great discretion in deciding whether to certify a class and its decision will not be overturned absent manifest error. Adams v. CSX Railroads, 615 So.2d 476 (La.App. 4th Cir. 1993); Ellis v. Georgia-Pacific Corporation, 550 So.2d 1310 (La.App. 1st Cir. 1989), writ denied 559 So.2d 121 (La. 1990).
McGee v. Shell Oil Co., supra.
Pursuant to La. C.C.P. art. 593.1, et seq, the trial court has the discretion to amend or recall its certification; enlarge, restrict or redefine the constituency of the class or issues; .
Clement v. Occidental Chemical Corp., supra.
In Hampton v. Illinois Central Railroad Co., 98-0430 (La.App. 1st Cir. 4/1/99), 730 So.2d 1091, the First Circuit Court of Appeal decertified a class of people purportedly injured when a railroad tank car leaked anhydrous ammonia. The plaintiffs in Hampton introduced into evidence the deposition of six proposed class representatives who were in the area the plaintiffs urged was affected by the ammonia leak. The court noted factual problems of causation similar to those identified by the trial court in this case. In its opinion the First Circuit wrote:
The testimony of these persons reveals they had various complaints of minor physical problems and emotional problems which they associated with the ammonia leak, the most common of which were asthma and a burning sensation in the eyes. The testimony of some of the proposed class representatives regarding the manifestations of their injuries did not correspond to the time of the ammonia leak. A review of this testimony indicates internal inconsistencies.
The appellate court, in reversing the trial court's original certification, found that the plaintiffs did not establish the causal link connecting the complaints to the gas leak sufficient to satisfy the requirement that there was a definable group of persons who were aggrieved by the incident.
In this case the trial court recognized that some, but clearly not most residents of Kenner, may have been injured by the exposure to sulfur dioxide. Class action procedure should not be used as a method to allow non-meritorious claims to be combined with legitimate claims thereby severely discounting the value of meritorious claims. The decertification of the class does not prejudice the rights of any individual class member. Individual class members, post-decertification, may pursue individual law suits. Decertification merely eliminates the class action procedural device. The trial court did not err when decertifying this class because no ruling on a common issue to all class members was made by the trial judge.

ISSUE TWO LAW AND ANALYSIS
Appellants also contend the trial court improperly dismissed the six class member plaintiffs' claims. The trial court found that, "the plaintiffs who testified in this case have failed to prove that their injuries resulted from this emission and the suit is dismissed as to them."
The trial court determined, "no individual in Kenner could have been exposed to a concentration of more than .36 parts per million, and then for only a few minutes." Plaintiffs' expert in toxicology, Dr. Schraeger, testified that he thought the concentrations were higher. He relied on the fact that since the plaintiffs complained of physical abnormalities, burning eyes, nausea and other physical symptoms, that these symptoms must have been caused by the sulfur dioxide emission of a high concentration. Dr. Schraeger testified that based on data he reviewed, *141 the concentrations of sulfur dioxide in the air was between "a part or below a part per million to two to three parts per million," with certain "pockets" containing levels between five and twenty parts per million. Dr. Schraeger testified that the adverse effects suffered by plaintiffs differs according to the concentration to which they were exposed. He further explained that asthmatics typically react to sulfur dioxide at levels below one part per million. In an individual who has a preexisting condition such as asthma, emphysema, or cystic fibrosis, exposure to levels of two to three parts per million would cause an ongoing exacerbation of respiratory problems. In the general population, ten to twenty parts per million is the minimal level which causes ongoing problems. He explained that these ongoing problems include a condition known as reactive airway disease syndrome (RADS), which can continue for years following a single exposure. In order to determine whether an individual has developed RADS, pulmonary function tests and diffusion studies are performed. Dr. Schraeger testified that if he were to assume the plaintiffs were exposed to levels between .5 to 5 ppm, he would expect they suffered toxicological ill effects consisting of burning eyes, coughing, difficulty breathing and nausea. He stated that he requested the medical records for the six plaintiffs who testified at trial, but never obtained these records. The trial court rejected his theory and found that "all of the acceptable scientific evidence in the case is to the contrary."
Dr. Laura Green, the defendant's expert toxicologist, testified that she was asked to evaluate whether the health of the plaintiffs was harmed by the Cyanamid release. She explained that sulfur dioxide is a very common gas in the atmosphere and that 70% of the sulfur dioxide is produced by nature. This gas has been studied for decades and these studies have shown that there is a sensitive subpopulation of people who are affected by low levels of sulfur dioxide. This group consists of certain asthmatics. These studies also show there are no long lasting effects from exposure to low levels of the gas.
Dr. Green examined the symptoms of each plaintiff based on their testimony and opined that the continuing complaints expressed by plaintiffs were not related to sulfur dioxide exposure. She concluded that some individuals who were exposed to sulfur dioxide may have experienced watery eyes or coughing over a few minutes to a few hours, but there were no long term health effects from this incident. She further opined that the nausea complained of by some plaintiffs could not be caused by the level of sulfur dioxide released. Finally, Dr. Green testified that even hyper-susceptible asthmatics would have had no long lasting health effects from this exposure. She strongly disagreed with Dr. Schraeger's opinion that RADS could develop from low level exposure; to develop RADS, one must be exposed to "screamingly" high values in the range of 40 to 60 ppm. She explained that the only reports of RADS in the literature involves people exposed to high levels of sulfur dioxide in a mine explosion.
The parties agreed that excess sulfur dioxide entered the atmosphere. The amount of sulfur dioxide released was a critical fact because the amount of sulfur dioxide released determined the concentration levels of exposure. Air modeling experts for each party calculated the exposure level of the citizens in Kenner by taking the amount of sulfur dioxide gas released, determining its dispersion rate into the atmosphere, and then projecting its direction of travel by using wind direction and speed.
The trial judge found that the plaintiffs did not establish the actual rate of emission with any degree of certainty. Dr. Reible, plaintiffs' expert, only testified as to the extreme bounds of the rate of emission, these being zero and 17 pounds per second. Plaintiffs' expert in air modeling, Mr. Francis Courtney, initially issued a *142 report using an emission rate of 34 pounds per second. Once Dr. Reible was retained, and testified that the highest possible emission rate was 17 pounds per second, Mr. Courtney issued another report. Although Dr. Reible testified that the peak rate of 17 pounds per second only existed for a few seconds at most, Mr. Courtney chose to use 17 pounds per second as the emission rate for the entire period. The defendant's air modeling expert, Dr. Richard Schulze, calculated the range of emission from .2 to .8 pounds per second. The trial court concluded that the emission rate was in the "neighborhood of .4 pounds per second and that no individual in Kenner could have been exposed to a concentration of more than .36 parts per million and then only for a few minutes."
The trial court found that "none of the severe and ongoing symptoms testified to by the plaintiffs could have resulted from this emission." The testimony of the defendant's expert, Dr. Green, supports this finding as does the OSHA standard admitted by Dr. Schraeger during cross examination. The federal OSHA safety standard allows for exposure of five parts per million of sulfur dioxide averaged over an eight hour work day. Based on the trial court's findings the exposure to the residents of Kenner was below the OSHA safety standard. Dr. Green testified that even using the highest levels alluded to in this case of 10 to 20 ppm, there would have been no long term health effects. Dr. Green's testimony was supported by articles on sulfur dioxide exposure prepared by the federal government. Furthermore, the testimony of Dr. John Schneller, the Chief Chemist at Cyanamid, established that shortly before this incident, the DEQ guidelines were revised to allow for additional sulfur dioxide emissions during start up, and that within a year of this incident, the defendant obtained a permit allowing for additional emissions. Dr. Schneller testified that had the new permit been obtained prior to this incident, the incident would not have been reportable under the DEQ standards. Additionally, Dr. Schneller testified that the sulfur dioxide levels are monitored by stations within the plant area and there was no evidence that the new ambient air standards were violated during this emission.
The trial court, in its Reasons for Judgment, seriously questioned the credibility of the six plaintiff class members, finding that the physical symptoms and injuries they attested to did not correspond with the scientific evidence. The trial court noted that plaintiff Wesley Tumblin did not experience burning eyes until the next day. This delayed symptomology is contrary to the scientific evidence presented that any adverse physical effects from sulphur dioxide exposure would be felt immediately. The trial court noted that plaintiff Christine Brown was located outside the limits of the plume when she allegedly smelled a foul odor at 5:00 p.m. The trial court found that the event, which precipitated this case, involves the production and discharge of sulphur dioxide "over a period of 75 minutes" in the late afternoon. Ms. Brown's alleged second exposure at 10:00 p.m., while within the plume area, is not supported by the time chronology. Additionally, Ms. Brown testified that she continues to suffer with problems catching her breath. The trial court determined that there was no scientific evidence or medical evidence to establish a causal connection between her continued shortness of breath and this incident.
Plaintiff Veronica Braggs testified that she was three miles away from the plant when she first smelled the odor, and then traveled to her home which, according to the trial court's finding, "lies outside of the boundaries of eastern most wind direction, testified to by the experts." Ms. Braggs testified that she continues to suffer from shortness of breath, nausea and has "constant problems." The trial court likewise found that these symptoms are not supported by the scientific evidence or any evidence of medical causation. Plaintiffs, Lugene Gray, Shelita Dunbar and Jannie *143 Lee, all testified that they suffered from medical problems of a duration that was not supported by the scientific or medical evidence presented by Dr. Green, which clearly the trial judge found more credible than Dr. Schraeger's opinion as to the toxic causation.
At trial, appellants failed to introduce any medical records or other documents to substantiate plaintiffs' complaints. The trial judge noted in his twelve page Reasons for Judgment: "Although every plaintiff but one testified to having received medical attention as a result of this event, not one physician was called to testify that their symptoms were related to the sulphur dioxide emission."
Appellants allege that the trial court erred by not entering an order in favor of appellants on the issue of liability. While the trial court did not specifically address appellee's negligence, this was not error because the trial judge relied on the lack of causation to support the decertification of the class and the dismissal of six individual claims. We note that the record supports a finding that Cyanamid was negligent. Cyanamid was restarting their processing plant after maintenance. During the startup period excess sulphur was introduced into the process without sufficient air circulation, causing the excess venting of sulphur dioxide. A meter that was supposed to measure the sulphur as it was being injected into the furnace was out of service and being repaired. Mr. Richard Bywater, Superintendent of the Cyanamid plant, testified that the "root cause (of the release) was an overfeed of sulfur, and obviously a contributing cause to that was having a sulfur flow meter that was not indicating." The operation of the plant without necessary metering devices necessary to comply with the plant's air discharge permit was a negligent act.
Appellate review of a trial court's factual findings is limited to a determination of whether the record contains a reasonable factual basis for the trier of fact's findings. In Rosell v. ESCO, 549 So.2d 840 (La.1989), the Court stated:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneous clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But *144 where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
[citations omitted]
In the instant case, the trial judge focused on causation and credibility. When causation and credibility are major issues, a factfinder's findings are entitled to "great deference," and may not be overturned unless they are manifestly erroneous. Guillory v. Insurance Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029. The issue of causation is a fact specific inquiry and we are called to decide whether the factfinder's conclusion is reasonable. Graves v. Page, 96-2201 (La.11/7/97), 703 So.2d 566.
In Rivera v. United Gas Pipeline Co., 96-502 (La.App. 5th Cir. 6/30/97), 697 So.2d 327, 337, a class action involving the release of natural gas, this Court stated:
There is no question that Louisiana law permits a plaintiff to recover for any physical injury suffered as the result of the negligence of another. In addition, in certain circumstances, a plaintiff may recover for fear and mental anguish sustained while a traumatic ordeal is in progress, regardless of whether the plaintiff sustained physical injury. Harper v. Ill. Cent. Gulf R.R., 808 F.2d 1139 (5th Cir.1987); Carroll v. State Farm Ins. Co., 427 So.2d 24 (La.App. 3d Cir. 1983). However "to recover for such mental anguish, ... an individual must show that he was involved in a hazardous situationthat is, within the zone of dangerand that his fear was reasonable given the circumstances." Harper, supra, at 1141 (footnote omitted). More than minimal inconvenience and worry must be shown before damages may be awarded. McDonald v. Ill. Cent. Gulf R.R., 546 So.2d 1287 (La.App. 1st Cir. 1989).
This court has, in the past, affirmed trial court damage awards where class members have been exposed to chemical or gas releases that resulted in similar physical symptomology as complained of in this case (i.e. burning eyes, coughing, nausea, fear and anxiety). See Rivera v. United Gas Pipeline Company, supra and Adams v. Marathon Oil Company, 96-693 (La. App. 5th Cir. 1/15/97), 688 So.2d 75. In Rivera this court affirmed the trial court's award of damages to five of the twenty-two class members who testified at the liability trial, and affirmed the dismissal of seventeen of the twenty-two class members who testified. In Husseiney v. United Gas Pipeline Company, a companion case that was consolidated with Rivera for appeal, this court affirmed the award of damages to sixteen of the twenty-four class member claimants who testified at the initial liability trial and affirmed the dismissal of eight class members. In Adams v. Marathon Oil Company, supra, this court affirmed the trial court awards of damages to some, but not all, class members who were exposed to Ethyl Mercaptan gas that had been negligently released into the atmosphere by the plant. In Adams representative class members testified to physical symptoms ranging from dizziness, nausea, membrane irritation, physical discomfort and/or mental anguish. In each of these cases, Rivera, Husseiney, and Adams, some class members were awarded damages and some class members were dismissed. Class members were dismissed for various reasons, including:
1. They were outside the zone of danger;
2. Their alleged injuries were not supported by scientific evidence;
3. Their claims lacked medical proof; or
4. The claimant was determined by the trial court to not be credible.
The trial court in this case identified similar reasons for dismissing the six class members in its Reasons for Judgment.

*145 CONCLUSION:

Had this court been sitting as the trier of fact, given Cyanamid's violation of its discharge permit, and plaintiffs' expert, Dr. Schraeger's, testimony that the sulfur dioxide exposure caused the adverse health effect complained of by plaintiffs, we may have decided this case differently and awarded damages consistent with the awards in Rivera and Adams. However, our task, in this case, is not to make findings of fact; rather, we are called upon to determine whether the trial court's findings of fact are supported by the record. We find that the evidence, taken in the light favorable to the defendant supports the trial judge's finding and that the trial court did not commit manifest error in his findings.
We do not, however, hold that suit arising from chemical releases that damage large numbers of people are not proper for class action certification. Our holding is limited to the facts presented in this case. As noted by Justice Calogero in his concurrence in Ford v. Murphy Oil, 96-2913 (La.9/9/97), 703 So.2d 542, at p. 551.
".. a mass tort case may well be appropriate for certification as a class action if it arises from a common cause or disaster as was the case in McCastle (McCastle v. Rollins Environmental Services of Louisiana, 456 So.2d 612 (La.1984)), which involved plaintiffs' complaints about discrete environmental emissions from a single defendant in a single geographical area under traditional tort theories."
For the foregoing reasons, the judgment of the trial court is affirmed. All cost of this appeal are assessed to plaintiffs.
AFFIRMED.
NOTES
[1] Although Article 593.1 was repealed as of July 1, 1997, the article remains effective for any class actions filed before that date. The issues formerly set forth in Art. 593.1 are addressed in Art. 592, La.Code Civ. Pro.