Judge Rosemary Ledet
I iThis is a mass tort, toxic exposure case. This is the second time this case has come before this court on appeal. The previous appeal was from the trial court’s December 15, 2011 judgment certifying a plaintiff class. Guidry v. Dow Chem. Co., 12-0436, 12-0198 (La.App. 4 Cir. 11/14/12), 105 So.3d 900 (“Guidry I”), writ granted in part, Guidry v. Dow Chem. Co., 12-2696 (La. 3/1/13), 108 So.3d 755 (“Guidry II”). In Guidryl, this court affirmed the certification decision. In Guidry II, the Louisiana Supreme Court denied writs on that issue.[1] The instant appeal is from the trial court’s April 5, 2016 judgment denying the joint motion to decertify the class (the “Joint Motion”) filed by the defendants, Union Carbide Corporation (“UCC”) and The Dow Chemical Company (“Dow”) (the “Defendants”).[2] For the reasons that follow, we affirm.
| .FACTUAL AND PROCEDURAL BACKGROUND
The basic underlying facts of this case are undisputed. In the early morning hours of July 7, 2009, a tank failure occurred at a chemical facility in Taft, Louisiana, which is located in St. Charles Parish. The chemical facility was owned and operated by UCC, a wholly owned corporate subsidiary of Dow. As a result of the tank failure, ethyl acrylate (“EA”), a volatile organic compound, was released into the air (the “EA Release”). The EA that was released from the tank was actually a mixture of three chemicals; it included two stabilizing chemicals in various quanti *81 ties—Hydroquinone (“HQ”) and Methyl Ether of Hydroquinone (“MEHQ”).
On the morning of the EA Release, the St. Charles Parish Department of Emergency Preparedness closed nearby roads and evacuated residents within a two mile area east of UCC’s facility. As a result of the EA Release, residents and visitors in three parishes—St. Charles, Jefferson, and Orleans—voiced complaints of odors and physical symptoms. Immediately after the EA Release, multiple lawsuits were filed, including this one.[3]
|sOn July 29, 2009, Sheila Guidry filed this suit in Orleans Parish against two defendants—Dow and the LDEQ. In her petition, Ms. Guidry averred that on July 7, 2009, she noticed a foul smell and that the smell caused her to experience headache, dizziness, and burning eyes. She further averred that EA is “an organic compound” and that it is “a possible carcinogen and should be considered hazardous at all times in any concentration.” Finally, she asserted various tort theories of liability against Dow for the EA Release.
On July 30, 2009, Ms. Guidry amended her petition to include class action allegations and to assert claims on behalf of a proposed class. In her petition, she set forth the following definition of the class:
Persons throughout Louisiana who were exposed to a release of any chemical by Defendants DOW and Union Carbide on or around July 7, 2009 and said release caused to that person personal injuries, emotional distress, loss of income, or the loss of the beneficial use, enjoyment, and exclusive possession of their property, or any other damages provable at the trial of this matter.
On August 6, 2009, she amended her petition again to name UCC as a defendant.
On June 9, 2010, Ms. Guidry filed a motion for class certification. On May 12, 2011, before the class certification hearing, Ms. Guidry filed a motion to substitute class representative. The trial court granted this motion; removed Ms. Guidry; and replaced her with Ramona Alexander, Vanessa Wilson, and Melissa Berniard. In May 2011, a two-day class certification hearing was held. Following the hearing, the trial court thus certified the following class:
The class consists of those persons living or located in the following described geographic areas: starting at the northwest corner of the class boundary, included in postal zip code 70068 in St. John the Baptist Parish, proceeding ' eastward along Lake Pontchartrain to 14postal zip code 70065, located in Jefferson Parish, and further eastward to postal zip code 70117, located in Orleans Parish; and proceeding from the southwest corner of the class boundary, included in postal zip code 70057 in St. Charles Parish, then proceeding further southeast to postal zip code 70031, then proceeding further eastward to postal zip code 70094 in Jefferson Parish, and then east/northeast to postal zip code 70117 in Orleans Parish, and all areas *82 included in between those points; and who were present in these locations for some time, from 4:30 am on July 7, 2009, until 3:30 pm on July 8, 2009, and who experienced the physical symptoms which include any or all of the following—eyes, nose, throat irritation, coughing, choking or gagging, or nausea, or headaches, dizziness, trouble breathing or other respiratory issues, as a result of their exposure to Ethyl Acrylate or other chemical substance released from tank 2310 at Union Carbide Corporation’s Taft, Louisiana Facility. Those persons living or located in those geographic areas and who experienced any of these physical symptoms will constitute the class and will be bound by the decision in this case.
This court affirmed the trial court’s decision certifying the class. Guidry I, supra. Although the Louisiana Supreme Court denied the Defendants’ writ on the certification issue, it granted the Defendants’ writ, in part, on another issue, holding:
Melissa Bernard [the spouse of appointed class counsel] is disqualified from serving as a class representative. See Stull v. Pool, 63 F.R.D. 702 (S.D.N.Y. 1974). In all other respects, the writ is denied. The matter is remanded to the district court for further proceedings pursuant to this Order.
Guidry II, 12-2696 at p. 1, 108 So.3d at 756.
On remand, Ms. Berniard was removed as a class representative and replaced by Bates Whiteside and Henry Homes. The case then proceeded to discovery. Thereafter, the Defendants filed a Joint Motion to Decertify Class (the “Joint Motion”). On October 21, 2015, a hearing was held on the Joint Motion. On April 5, 2016, the trial court rendered judgment denying the Joint Motion. This appeal followed.
^DECERTIFICATION MOTION GENERAL PRINCIPLES
In reviewing a trial court’s ruling on a decertification motion, the following general principles apply. First, a trial court’s decision denying a decertification motion is an interlocutory judgment that is immediately appealable by law. La. C.C.P. art. 592 A(3)(c);[4] Billieson v. City of New Orleans, 09-0410, 09-0811 p. 4, n. 2 (La. App. 4 Cir. 11/12/09), 26 So.3d 796, 799; Sutton Steel & Supply, Inc. v. BellSouth Mobility, Inc., 07-146, 07-512 p. 7 (La.App. 3 Cir. 12/12/07), 971 So.2d 1257, 1263.[5]
Second, “[a] trial court’s decision denying a motion to decertify a class is one involving a valid exercise of discretion and therefore is reviewed under an abuse of discretion standard.” Jones v. Capitol Enterprises, Inc., 11-0956, pp. 11-12 (La.App. 4 Cir. 5/9/12), 89 So.3d 474, 484 (citing Billieson, 09-0410, 09-0811 at p. 9, 26 So.3d at 802 (citing Doerr v. Mobil Oil Co., 04-1789, p. 4 (La.App. 4 Cir. 6/14/06), 935 So.2d 231, 234); Richardson v. American Cyanamid Co., 99-675-82 (La. App. 5 Cir. 2/29/00), 757 So.2d 135). Stated differently, “[a] trial court has broad discretion in deciding whether to certify a class; it also *83 has the same discretion to amend or reverse its decision at any time.” Mire v. Eatelcorp., Inc., 04-2603, p. 8 (La.App. 1 Cir. 12/22/05), 927 So.2d 1113, 1118 (citing Mathews v. Hixson Brothers, Inc., 03-1065, p. 4 (La.App. 3 Cir. 2/4/04), 865 So.2d 1024, 1028). “The appellate court will only decertify a class where there is an abuse of the trial judge’s vast discretion.” Mayho v. Amoco Pipeline Co., 99-620 to 99-624, p. 4 (La.App. 5 Cir. 12/15/99), 750 So.2d 278, 281.
Third, by statute, a trial court is authorized to modify or recall its certification decision at any time prior to a decision on the merits. La. C.C.P. art. 592 A(3)(d) (providing that “(i]n the process of class certification, or at any time thereafter before a decision on the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.”). Thus, “Article 592 allows a trial judge to decertify a class at any time before a decision on the merits of the common issues.” Jones, 11-0956 at p. 23, 89 So.3d at 490.
Fourth, the “law of the case” doctrine does not prohibit an appellate court that has previously reviewed a class certification decision from reviewing the class certification on a subsequent appeal when the court is presented with new issues or questions as to whether the certification was proper. See Mire, 04-2603 at p. 8, 927 So.2d at 1117-18. Neither the trial court’s initial order of certification nor this court’s opinion affirming that order bars reconsideration of the propriety of maintaining the class if the fundamental nature of its cause of action changes. Id.
Fifth, Louisiana courts uniformly have held that *‘[i]n the absence of materially changed or clarified circumstances, or the occurrence of a condition on |7which the initial class ruling was expressly contingent, courts should not condone a series of rearguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling.” Doerr, 04-1789 at p. 4, 935 So.2d at 234-35 (quoting 3 Alba Conte and Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 7:47 (4th ed. 2002).; see also Orrill v. Louisiana Citizens Fair Plan, 11-1541, p. 3 (La.App. 4 Cir. 6/13/12), 96 So.3d 647, 649; Doe v. Jo Ellen Smith Med. Found., 12-0966, p. 6 (La.App. 4 Cir. 4/24/13), 115 So.3d 655, 660; Jones, 11-0956 at p. 27, 89 So.3d at 492.
Sixth, it is proper to grant a decer-tification motion “when there has been a material change in the facts, law, or circumstances since the initial class ruling.” Doe, supra (citing Billieson, 09-0410 at p. 9, 26 So.3d at 802).
Seventh, a change or clarification is material when it “eliminated or substantially impair[s] any of the requisite elements for maintenance of a class action.” Mire, 04-2603 at p. 8, 927 So.2d at 1118 (citing Richardson, 99-675 at pp. 7-10, 757 So.2d at 138-39); see also Mayho, 99-620 to 99-624 at p. 5, 750 So.2d at 281 (holding that a certified class is always subject to modification should later developments during the course of the proceedings require).
- Eighth, a significant factor in deciding a decertification motion is whether either the parties or the class would be unfairly prejudiced by a change in proceedings at that stage of the proceeding. Jones, 11-0956 at p. 26, 89 So.3d at 491-92 (citing 3 Alba Conte and Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 7:47 (4th ed. 2002)(quoting MANUAL FOR COMPLEX LITIGATION, § 30.18 *84 (2d ed.)). The procedural posture of the case thus is an|simportant consideration in assessing the prejudice that would result from a change in the proceedings. Id.
Ninth, “decertification is a ‘drastic step,’ not to be taken lightly.” 3 NEWBERG ON CLASS ACTIONS, § 7:37 at 190. “In lieu of decertification, courts may prefer less drastic alternatives, such as bifurcation of liability and damages.” Id. Alternatively, the court may modify the class definition. See La. C.C.P. art. 592 (A)(3)(d) (providing for modification of the class definition).
Tenth, and finally, Louisiana has a policy favoring class actions; “ ‘[t]he Louisiana Supreme Court has mandated that errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action.’” Orrill, 11-1541 at p. 2, 96 So.3d at 648 (quoting Wallace v. Louisiana Citizens Prop. Ins. Corp., 10-0647, p. 5 (La.App. 4 Cir. 12/6/10), 53 So.3d 514, 518).
DISCUSSION
The narrow issue before us is whether there has been a material change in the facts or circumstances since the initial class ruling that would warrant class de-certification.[6] Here, it is undisputed that there has been no material change in the |9law. The determination of whether there has been a material change in the facts or circumstances to warrant decertification, as the trial court noted, requires a comparison of the pre-certification and post-certification evidence. In order to provide a background for analyzing that issue, it thus is necessary to summarize that evidence.

Evidence presented at the certification hearing

At the certification hearing, the sole causation evidence the Plaintiffs presented was the testimony of Patricia Williams, PhD, their expert toxicologist. Dr. Williams’ testimony focused on general— as opposed to specific—causation.[7] Dr. *85 Williams explained that she reviewed 116 client intake forms, which provided self-reported, specific clinical symptoms. Based on her review of those forms, she created three charts: (i) a chart categorizing those clients’ symptoms and complaints; (ii) a chart correlating those client’s symptoms with the chemicals released—EA, HQ, and MEHQ; and (ii) a chart summarizing the zip codes at which those clients resided at the time of their alleged exposure.
|inAs the trial court noted in its December 15, 2011 reasons for judgment on the certification motion, Dr. Williams testified that the EA that was released included two stabilizing chemicals in various amounts—HQ and MEHQ—and that “[e]ach chemical in various concentrations has health effects reflected on material safety data sheets, which were considered by the court and the parties[’] experts.” The trial court further noted the following:
Dr. Williams testified that there is scientific evidence that can be used and documented to show that a particular chemical can cause particular symptoms or diseases and that in her opinion the EA release also included the release of HQ and MEHQ in smaller but significant quantities, producing a cumulative effect on those exposed to these chemicals. Dr. Williams concluded that the chemicals released more probably than not did cause the symptoms as alleged by the class, and that the symptoms of class members she sampled were consistent with her general findings of general causation.
Dr. Williams also stated that to reach a general causation opinion one must look at peer reviewed journal articles, government documents, state documents, reference textbooks, and everything that is known about the chemical. Dr. Williams explained that the method she used to come to her general causation opinion on the chemicals involved in this case involved a review of over one hundred [116] intake forms of the class members who alleged the various grievances that could be caused by EA exposure. Dr. Williams concluded that the method was sound, generally accepted and supported her finding that more probably than not the symptoms alleged by the class were consistent with her general findings of causation from the release of EA.
The trial court stated that it was clear this class action arose out of a common disaster—the release of EA, which include HQ and MEHQ, by Dow and UCC on July 7, 2009. The trial court further stated that “[t]he common causation that plaintiffs’ class representatives present on behalf of the class is whether or not the EA, HQ, and MEHQ release can cause damages consistent with the class definition.” The trial court concluded as follows:
Despite the conflicting opinions as to the toxicity level that the class members were possibly exposed to, neither [the Plaintiffs’ nor | nthe Defendants’] expert disputed that determining the level necessary to cause harm cannot be accomplished by using a general causation approach. The actual damage that class members could have suffered given the level of exposure is not in before this Court in determining class action certification. The Court only needs to find and does hold that a method of assessing general causation for the whole of the class exists.
*86 Affirming the certification decision, this court noted, in Guidry I, that Dr. Williams testified “it was more probable than not that the symptoms alleged by the class were caused by the chemical release from the Union Carbide facility and that the symptoms of the class members that she sampled were consistent with her findings of general causation.” 12-0436, 12-0198 at p. 2, 105 So.3d at 902-03.

Evidence presented at the decertification hearing

The Defendants’ primary evidence at the decertification hearing, as the trial court noted, was the air dispersion model of the Plaintiffs’ air dispersion expert, Dr. Paolo Zannetti, coupled with Dr. Williams’ post-certification deposition testimony.[8] Dr. Zannetti’s model approximated the likely concentration of EA present in the relevant geographic area at various times following the EA Release.[9]
Dr. Zannetti’s model, as the Defendants emphasize, established two points. First, the concentration of EA for the class members present in two zip codes included in the class definition—70068 (LaPlace) and 70070 (Luling)—was zero. Those class members present in those zip codes were not in the plume developed by Dr. Zannet-ti’s model. Second, for the remaining class members present in the other zip codes, the concentration of EA varied; however, it was uniformly less l^than the 8.3 parts per million (“ppm”) standard under the Acute Exposure Guideline Levels (the “AEGL”) set by the Environmental Protection Agency (“EPA”). Dr. Williams, as the Defendants emphasize, mentioned the AEGL 8.3 ppm standard several times in her certification hearing testimony.
In her post-certification deposition, Dr. Williams was questioned extensively regarding Dr. Zannetti’s model and the impact, if any, on her common causation opinion. Summarizing Dr. Williams’ deposition testimony on this point, the trial court, in its April 5, 2016 reasons for judgment on the decertification motion, stated:
Dr. Williams testified in her deposition that, among other things, the Emergency Response Planning Guidelines (ERPG) for EA promulgated by the American Industrial Hygiene Association is a protective action criteria used in emergency response planning when there is a release. She also testified that the ERPG level of 10 parts per billion “is a protective that only transient health effects would occur below that level.” Dr. Williams further testified that it is more appropriate to use the ERPG guideline since this case and the currently defined class is about those transient adverse health effects. Notably, the record shows that the ERPG level is defined as “the maximum airborne concentration below which it is believed nearly all individuals could be exposed for up to one hour without experiencing other than mild, transient adverse health effects .... ” The AEGL standards represent levels below which “mild and progressively increasing but transient and nondisabling odor, taste and sensory irritation or certain asymptomatic, nonsensory effects,” such as the symptoms defining the current class, can *87 be produced. After reviewing Dr. Zan[n]etti’s concentration data on the air dispersion model, Dr. Williams testified in pertinent part that “they [the class representatives] were in a range that they would have these transient adverse health effects.” (Emphasis in original).

Trial court’s ruling on the Joint Motion

Addressing the merits of the Defendants’ Joint Motion, the trial court framed the Defendants’ position as follows:
Defendants specifically contend that the air dispersion model of Plaintiffs’ [air dispersion] expert, Dr. Paolo Zan[n]etti, subsequent to the initial certification hearing, and Dr. [Patricia] Williams’ deposition | ^testimony, contradict the ‘general causation’ opinion of Dr. Williams, [the Plaintiffs’ toxicology expert] upon which the class certification was based (predominance), and more particularly, upon which the geographic boundaries of the class are defined (nu-merosity and ascertainability); thereby, creating the requisite material change in circumstances so as to eliminate or substantially impair the numerosity, ascer-tainability and predominance requirements to maintain a class action under Article 591 et seq. of the Louisiana Code of Civil Procedure.
The trial court set forth its understanding of Dr. Williams’ causation testimony at the certification hearing in its reasons for judgment as follows:[10]
[D]uring the initial certification hearing, Dr. Williams testified that her opinions were based on the general causation approach and she discussed the various concentration guidelines concerning exposures to EA as the underlying premise for her general causation opinions. When discussing the Acute Exposure Guideline Levels (AEGL), Dr. Williams testified, “EPA has come up with the decision that at 8.3 parts per million, you should not see the irritant symptoms or the transient symptoms that would occur from—that are known to occur from ethyl acrylate. She also discussed an article regarding a different model that indicated lower concentration levels triggering irritant effects—ie. irritancy and olfactory effect at 0.4 parts per million—and concluded, “[s]o there are much lower levels than the 8.3 parts per million.... ” Further, Dr. Williams discussed the comparatively low odor threshold for EA at 24 parts per billion and, after noting the “variability in the human race with the sense of smell,” she opined that it is possible for some people to smell EA at levels below the concentrations necessary to create toxic or irritant effects.
Comparing the certification and decerti-fication evidence, the trial court concluded that the Defendants failed to establish a material change to warrant decertification. In so finding, the trial court reasoned as follows:
[Nfeither Dr. Zan[n]etti’s air dispersion model nor Dr. Williams’ deposition testimony contradicts Dr. Williams’ pre-certification “general causation opinions that were used to define the geographical boundaries of the class” during the initial certification. Instead, Dr. Williams’ subsequent testimony, taken as a whole, expounded upon her pre-certification general causation opinion in light of Dr. Zan[n]etti’s air concentration data. Moreover, this Court | ]4notes that *88 on appeal to the Fourth Circuit, Defendants, as they do now, contended that numerosity and ascertainability were not satisfied.... [T]his Court further finds that Defendants have failed to produce evidence of a material change that eliminates or substantially impairs the nu-merosity and ascertainability requirements.
In the same vein, Defendants contend that because Dr. Williams testified that there exists variabilities [sic] among individuals relating to their precise odor threshold, then individual trials are necessary; and therefore, the predominance element no longer exists.... [T]his Court finds that Defendants’ contention lacks merit for three reasons. First, Dr. Williams provided this testimony at the initial certification hearing, ... and Defendants made this same argument on appeal.... Thus, on this basis alone, Defendants’ argument fails because this Court will not condone a series of re-arguments on class issues under the guise of the instant motion to decertify. Second, even after considering Dr. Williams’ testimony, the class was certified and the Fourth Circuit upheld the trial court’s finding of predominance.... Lastly and most importantly, this Court notes the critical difference between general and individual causation, which, based on Defendants’ argument, they misinterpret.

Lack of a material change in the facts or circumstances

As noted earlier, the narrow issue presented here hinges on whether there has been a material change in the facts or circumstances since the certification decision. Defendants contend there was a material change in the facts and circumstances as a result of Dr. Zannetti’s air dispersion model. No air dispersion evidence was presented at the certification healing. Dr. Zannetti’s model, the Defendants contend, was not only new scientific evidence, but also materially changed Dr. Williams’ pre-certification, common causation opinion.
Continuing, Defendants contend that Dr. Zannetti’s model showed EA concentrations so low—zero in two of the zip codes—that health impacts would neither be expected nor extrapolated across the population as a whole. As a result, the Defendants contend that “[Dr.] Williams had to shift her focus in assessing general causation from the population as a whole to the individual.” Given this shift in focus, Defendants contend that Dr. Williams’ deposition testimony 11r,“renders it impossible for Appellees [the Plaintiffs] to prove causation on a class-wide basis; necessarily then, common issues of fact cannot and will not predominate over individual ones at trial.” The Defendants submit that this is the material change in the facts or circumstances on which their Joint Motion properly hinged and that the trial court erred in finding to the contrary.
Dr. Williams’ opinion at the time of the certification decision, the Defendants note, was premised on the assumption that either the EA concentration exceeded the AEGL threshold standard of 8.3 ppm or that the EA mixture—which included HQ and MEHQ—amplified the effects of lower levels of EA to achieve a community-wide health effect. The Defendants emphasize that Dr. Zannetti’s model established that the EA concentration level was well below the 8.3 ppm threshold across all the zip codes and zero in two zip codes—70068 and 70070. Since Dr. Zannetti did not model HQ or MEHQ, the Defendants contend there is no evidence in his reports or elsewhere in this record to sustain Dr. Williams’ alternative amplification theory.
*89 The Defendants further contend that the trial court erred in concluding that Dr. Williams’ post-certification deposition testimony merely expounded upon her prior testimony based on the fact she referred in her earlier testimony to concentration levels below 8.3 ppm. The Defendants contend that the change in Dr. Williams’ testimony was that she abandoned her former testimony regarding EA levels above 8.3 ppm, which was the basis for her common causation opinion. According to the Defendants, “[w]hile [Dr.] Williams may have elaborated in her testimony on the issue of whether adverse health effects could occur at levels below 8.3 ppm, for the first time she changed her testimony to state that such effects at those lower levels [which are odor thresholds] are unique and specific to 11fian individual.” Given Dr. Williams’ testimony that there exist variations among individuals regarding their precise odor thresholds, the Defendants contend that individual trials will be necessary to establish liability and damages. It follows, the Defendants contend, that the predominance element no longer exists in this case, that a material change in the facts and circumstances has been established, and that the trial court erred in denying their Joint Motion.
In support of their position, the Defendants cite several cases including Alexander v. Norfolk S. Corp., 11-2793 (La. 3/9/12), 82 So.3d 1234; and Richardson, supra. Although the Alexander case was decided before Guidry I and Guidry II, the Defendants contend that the evidence in this case has drastically changed since Guidry I and Guidry II were decided. Given the new, post-certification evidence regarding the low concentration level of EA to which the class members were exposed, the Defendants contend that this case now is exactly like the Alexander case.
Likewise, the Defendants contend that this case is analogous to Richardson, which involved a sulfur dioxide release. In that case, the new evidence showed that the exposure to the class was so minimal that the sulfur dioxide release would not cause injury to the majority of the class members. There, the trial court decertified the class; and the appellate court affirmed. The rationale for decertifying the class, the Defendants point out, was twofold. First, the numerosity and commonality requirements previously found to exist were no longer met. Second, to the extent there were some people with high sensitivities who might suffer symptoms at low levels, those people could pursue their actions individually. Defendants contend that Richardson thus stands for the proposition that, when post-certification testimony negates the plaintiffs’ ability to prove causation at the class level, the l17testimony constitutes a material change in the facts and circumstances to justify decertification. The Defendants contend that such is the case here.
The Plaintiffs counter that the Defendants have confused the applicable principles of class certification with those of class decertification. The Plaintiffs further counter that the Defendants have failed “to appreciate pertinent standards and distinctions, including the critical difference between general or common causation (as is required for class certification) and individual causation (as is shown at trial of the class representatives).”
Addressing the two issues raised by Dr. Zannetti’s model, the Plaintiffs contend that the proper remedy for the class members located in the two zip codes that Dr. Zannetti’s model established the exposure concentration was zero would be to redefine the class, if the trial court determines it is warranted, not to decertify it. As to the other issue regarding the low concen *90 trations of EA in the other zip codes, Plaintiffs emphasize that Dr. Williams’ opinion on common causation, which the trial court relied upon in certifying the class, was not tied to a specific EA concentration level.
Addressing these two issues, we first find, as the Plaintiffs contend, that although Dr. Zannetti’s model arguably called into question the geographic parameters of the class, this is an issue that does not warrant decertification. Rather, this is an issue that can be resolved by the less drastic procedural device of redefining the class. See La. C.C.P. art. 592 A(3)(d) (providing for modification of the class definition).
Second, we find the Defendants’ reliance on the fact that Dr. Zannetti’s model established exposure to low concentrations of EA across the remaining zip codes as supporting decertification is misplaced. Both at the certification hearing 11Rand in her post-certification deposition, the Plaintiffs’ expert, Dr. Williams, maintained her opinion that general causation was established—that EA, HQ, and MEHQ release (the mixture) can cause damage consistent with the class definition. Indeed, in her post-certification deposition, Dr. Williams testified that although she was not provided with exposure data for any chemical other than EA, “we do know you have a mixture and, so, you cannot ignore [the mixture].” She reiterated that this case is not about “individual chemicals;” and she emphasized that “for general causation, I have to include everything that’s in the mixture.” Accordingly, we find no error in the trial court’s finding that Dr. Williams’ post-certification deposition testimony merely expounded on her earlier certification testimony on common causation and that it did not change it.
Neither the Richardson case nor the Alexander case—two of the cases cited by the Defendants—dictate a different result here. In Richardson, the trial court decer-tified the class following a trial on the merits; here, there was no trial on the merits, only a motion hearing. See Rapp v. Iberia Par. Sch. Bd., 05-883, p. 9 (La.App. 3 Cir. 3/1/06), 926 So.2d 30, 37 (distinguishing Richardson on the same basis, noting “[h]ere, there has been no trial on the merits”). Moreover, in Richardson, the trial court decertified the class; in this case, the trial court refused to decertify the class. Doerr, 04-1789 at p. 4, 935 So.2d at 235.
Although the Alexander case involved a release of the same chemical (EA), the procedural posture and factual background of that case were entirely different from this case. Procedurally, Alexander was a certification decision. Our determination that the trial court did not err in finding there was no material change in the facts or circumstances since the class was certified renders it unnecessary for us to revisit all the criteria for class certification on this appeal.
1,(Regardless, factually, the expert scientific evidence in Alexander was not the same as in this case. Summarizing the facts in the case before it, the Supreme Court noted:
Dr. Marcus Iszard, plaintiffs’ toxicologist, testified that only those individuals with a unique susceptibility to ethyl acrylate would exhibit physical symptoms at the extremely low concentrations involved in the release, that this susceptibility would manifest itself in less than .1 percent of any given population, and determining whether any particular person was within this microcosm of the population would require an entirely individualized understanding of each person’s health, medical history, records, and other variables impacting exposure. In addition, Dr. Iszard testi- *91 Red that the dose of exposure would be impacted by important individual variables, such as the specific location of the plaintiff at the time of the exposure, and whether the plaintiff moved from location to location during the exposure. Similarly, the defense toxicologist, Dr. Wernke, testified the symptoms complained of by the plaintiffs, such as irritation of the eyes and nose, respiratory irritation, coughing, nausea, and vomiting, are not specific or unique to ethyl acrylate exposure, but are common symptoms with a myriad of causes.
Alexander, 11-2793 at p. 3, 82 So.3d at 1236.[11] Comparing the expert testimony in Alexander with Dr. Williams’ testimony, summarized throughout this opinion, we cannot conclude, as the Defendants urge, that the scientific evidence in this case is the same as in Alexander. We thus find Alexander distinguishable.
| so As mentioned earlier in this opinion, a significant factor in deciding a decertification motion is whether either the parties or the class would be unfairly prejudiced by a change in the proceedings at this juncture. Jones, 11-0956 at p. 26, 89 So.3d at 491-92. The Plaintiffs contends that such is the case here. As the Plaintiffs point out, this court has noted the appropriateness of the procedural device of a class action to aid plaintiffs in recovering damages in this type of case involving small claims. Jones, 11-0956 at p. 27, 89 So.3d at 492 (quoting Doerr, 04-1789 at p. 10, 935 So.2d at 238);[12] see also Stephen H. Kupperman and David G. Radlauer, Louisiana Class Actions, 74 Tul. L. Rev. 2047, 2078 (2000) (noting that “the so-called ‘negative value’ suit ... often found voice in Louisiana cases as a statement that the ‘smallness of the recovery’ favors class *92 treatment.”). Considering this policy consideration factor, we find the potential prejudice to the class that would result from a change in procedure at this stage of the litigation—which arises out of a 2009 incident and has been pending for multiple years—buttresses our finding that the trial court did not abuse its discretion in denying the Joint Motion to decertify.
21 Summarizing, the Defendants’ arguments for decertification—as the Plaintiffs contend and the trial court found—are very similar to those we rejected in our earlier decision affirming the trial court’s certification decision, Guidry I. The Defendants have failed to prove a material change in the facts or circumstances since the initial class certification ruling that would warrant class decertification. Accordingly, we cannot conclude the trial court abused its discretion in denying the Defendants’ Joint Motion.
DECREE
For the foregoing reasons, the judgment of the trial court denying the Defendants’ Joint Motion to decertify the class is affirmed.
AFFIRMED

. In Guidry II, the Supreme Court granted the Defendants’ writ in part on another issue, holding that "Melissa Berniard [the spouse of appointed class counsel] is disqualified from serving as a class representative.” Guidry II, 12-2696 at p. 1, 108 So.3d at 756. On all other issues, the Supreme Court denied their writ.

. Although the State of Louisiana through the Department of Environmental Quality ("LDEQ”) is also named as a defendant, the LDEQ is not a party to this appeal.

. The instant suit, among others, was removed to federal court and remanded back to state court. Berniard v. Dow Chem. Co., 481 Fed.Appx. 859 (5th Cir. 2010) (unpub.). According to the Defendants, there are seventeen pending suits arising out of the EA Release; however, this is the only suit that was filed in Orleans Parish. The other suits were filed in St. Charles Parish, which is where the EA Release occurred. See Dufour v. Dow Chem. Co., 12-912, p. 2, n. 1 (La.App. 5 Cir. 5/23/13), 119 So.3d 630, 632 (noting that "[a]s a result of the toxic release, seventeen lawsuits were filed [in St. Charles Parish]. Of those seventeen lawsuits, twelve suits involved individually joined plaintiffs (the 'Mass Join-der Plaintiffs’); the trial court classified the other five suits as class action suits (the 'Class Action plaintiffs’). The trial court consolidated the twelve Mass Joinder Plaintiffs’ suits.”)

. La. C.C.P. art. 592 A(3)(c) provides that "[a] suspensive or devolutive appeal, as provided in Article 2081 et seq. of the Code of Civil Procedure, may be taken as a matter of right from an order or judgment provided for herein.”

. Pursuant to La. C.C.P. art. 2083, an interlocutory judgment is appealable only when expressly provided by law. The Code specifically designates a few interlocutory judgments as appealable; a judgment denying a motion to decertify a class is one, Frank Maraist, 1 LA. CIV. L. TREATISE, CIVIL PROCEDURE § 14:3 (2d ed.) (citing Sutton Steel, supra, for the proposition that the denial of a motion to decertify a class action is an appealable judgment).

. On appeal, the Defendants assert the following three assignments of error:
1. The trial court manifestly erred when it held that Williams' post-certification testimony that causation is a plaintiff-specific inquiry merely “expounded upon” not altered—Williams' pre-certification opinion that causation can be determined on a class-wide basis by looking at common exposure and common symptoms.
2. The trial court applied the wrong legal standard in its analysis, erroneously concluding that commonality and predominance were one combined requirement for class certification. This legal error irreparably tainted the fact finding process, necessitating de novo review. Moreover, the trial court erroneously concluded that Zannetti’s report and Williams’ deposition testimony, both of which occurred post-certification, satisfied the predominance requirement for class certification.
3. The trial court erred in determining that the new and different evidence from Zan-netti and Williams did not impair the ascer-tainability, numerosity, and superiority requirements for certification.

. This court explained the distinction between general and specific causation in Watters v. Dep’t of Soc. Servs., 08-0977, p. 17, n. 18 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1143, as follows:
General causation refers to proving exposure in a dose sufficient to cause health effects—that exposure to mold can cause disease. See Zimko v. American Cyanamid, 03-0658, p. 28 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 485-86, writ denied, 05-2102 (La. 3/17/06), 925 So.2d 538. Specific causation refers to proving a sufficient causative link between the alleged health problems and the specific type of mold. Id. Distinguishing these two causation problems, a commentator notes that "[o]ne is the problem of establishing that the chemical involved is capable of causing the type of harm from which the plaintiff suffers.... The other problem relating to proof of causation is that of establishing, given that the toxic substance in question *85 can cause harm of the type suffered by the plaintiff, that the plaintiff’s harm did in fact result from such exposure.” Daniel A. Farber, Toxic Causation, 71 Minn. L.Rev. 1219, 1227-28 (1987).

. The trial court noted that the Defendants’ Joint Motion was also based on the filing of the Motion to Re-Open and Extend the Opt-Out Deadline. The trial court expressly found that this factor did not support the Defendants' Joint Motion.

. Actually, Dr. Zannetti ran two models; the second model showed the data on fifteen minute intervals. The Defendants note that, for purposes of this appeal, they accept the results of Dr. Zannetti's second model; however, they reserve the right to contest those findings later.

. We note that different trial court judges ruled on the certification motion and the de-certification motion.

. In Smith v. City of New Orleans, 13-0802, p. 14, n. 7 (La.App. 4 Cir. 12/23/13), 131 So.3d 511, 520, we distinguished the facts before us from those in Alexander and summarized the Supreme Court’s holding in Alexander as follows:
In Alexander, the Supreme Court extensively discussed the predominance requirement of La. Code Civ. P. art. 591(B)(3) as it applied to putative class members who sought class certification to seek damages as a result of allegedly being impacted by a release of chemicals from parked railroad cars. The district court granted class certification, which our Court affirmed on appeal. The Supreme Court ultimately held that each member of the proposed class will necessarily have to offer different facts to establish liability and damages which controverts the purpose of preventing class certification from degenerating into a series of individual trials. Id., 11-2793, p. 3, 82 So.3d 1234, 1236. The Supreme Court held that common issues of law and fact did not predominate because there was ‘‘undisputed evidence in the record demonstrating that any determination of damages will be dependent upon proof of facts individual to each putative class member” regarding whether they had a unique susceptibility to the released chemical. Id., 11-2793, p. 3, 82 So.3d 1234, 1236.

. This court in Doerr stated:
“[I]t is a troubling proposition that a tort-feasor can be relieved of responsibility if its conduct produces minimal harm, albeit to many people. Surely a wrong that causes a hundred dollars of harm to ten thousand people is of no less concern than a wrong that causes a million dollars of harm to an individual. To declare the former harm de minimus, and not worthy of redress is to undermine the dual concerns of tort law: accountability for the wrongdoer and compensation for the victim.
.,. [I]t is a legitimate concern that the courts not be bogged down by claims that are minimal. It makes little economic sense to have parties engage in litigation over sums greatly outweighed by the expense of the legal process. However, where, as here, the claims of a large population can be processed efficiently by virtue of class certification, there can be no valid reason not to hold a corporate wrongdoer accountable and to afford appropriate relief to the individual members of the class.”
04-1789 at p. 10, 935 So.2d at 238.